### WILLIAMS v. UNITED STATES TRUST CO.

*(Supreme Court, General Term, First Department.   May 15, 1891.)*

1. PLEDGE—SALE OF SECURITIES.

 A promissory note, given by plaintiff to defendant for money loaned, recited that certain bonds had been pledged to defendant as security, with authority to sell the same without notice, and provided that, in case of depreciation in the market value of such security, a payment should be made on account, or additional security given, so that said market value should always be at least 20 per cent. more than the amount unpaid on the note, and, in case of failure to do so, the note should be deemed

to be due and payable forthwith, and defendant might immediately reimburse itself by sale of the security. *Held,* that this provision for a sale, without demand or notice, was not limited to a sale on failure of plaintiff to keep his margin good.

2. SAME—WAIVER.
   Plaintiff testified to a promise to him by the president of defendant company that the securities should not be sold below a certain price; but he admitted that a letter afterwards sent to him by defendant was inconsistent with such promise; that he regarded the letter as a revocation thereof; and that defendant had a right to revoke such promise. *Held,* that he could not rely on the promise as a waiver by defendant of its rights under the note.

Appeal from circuit court, New York county.

Action by William S. Williams against the United States Trust Company of New York. Plaintiff appeals from a judgment for defendant entered on the dismissal of the complaint at the trial, and on a verdict for defendant directed by the court on defendant's counter-claim.

Argued before VAN BRUNT, P. J., and DANIELS and LAWRENCE, JJ.

*Dos Passos Bros.,* (*John R. Dos Passos,* of counsel,) for appellant. *Stewart & Sheldon,* (*Joseph H. Choate* and *Edward W. Sheldon,* of counsel,) for respondent.

LAWRENCE, J. Originally there were two actions pending between these parties,—one brought by the plaintiff in the superior court, to recover $105,-000, as damages for the alleged conversion by the defendant of certain stocks, bonds, and securities belonging to the plaintiff; the other being an action in this court, brought by the defendant against the plaintiff to recover a balance alleged to be due by the latter to the former upon the closing of the loan, and the sale of the securities pledged as collateral therefor. When the action in this court was reached for trial, by consent of the parties, an order was entered removing the action in the superior court into this court, and consolidating the two actions into one, the result of which was that the cause of action alleged by the trust company in the action in this court was pleaded as a counter-claim. The transaction out of which the controversy between these parties arose occurred on the 1st of March, 1884, when the plaintiff obtained a loan from the defendant of $300,000, for which he gave his note, as follows:

"$300,000.                                    NEW YORK, March 1st, 1884.

"Six months after date, without grace, I promise to pay to the United States Trust Company of New York, at the office of said company, in the city of New York, three hundred thousand dollars, for value received, with interest at the rate of 4 per cent. per annum, having pledged to the said company as security (with authority to sell the same, or any securities that may be substituted in lieu thereof, on the non-performance of the promise, in such manner as they in their discretion may deem proper, without notice, either at the New York Stock Exchange or at public or private sale, and to apply the proceeds thereon) four hundred thousand dollars Louisville and Nashville R. R. Co. first mortgage bonds, N. O. and Mobile Division. In case of depreciation in the market value of the security hereby pledged, or which may hereafter be pledged, for the loan, a payment is to be made on account, or additional approved security given, so that the said market value shall always be at least twenty per cent. more than the amount unpaid of this note. In case of failure to do so, this note shall be deemed to be due and payable forthwith, anything hereinbefore expressed to the contrary notwithstanding, and the company may immediately reimburse itself by sale of the security.

"W. S. WILLIAMS, 32 Broad St., Office U. S. & Co."

At the time of giving the note the plaintiff pledged and transferred to the defendant first mortgage bonds of the Louisville & Nashville Railroad Company (New Orleans & Nashville Division) of the par value of $400,000. It is admitted that on or about the 1st of July, 1884, the defendant collected and

received the sum of $3,500 for interest coupons maturing on that day; and that on or about the 7th day of July, 1884, the plaintiff paid to the defendant the sum of $1,500; which sums the defendant applied on account of said note. The note by its terms became due on the 1st of September, 1884, and, unless the defendant waived or consented to some alteration of those terms, the defendant would have been entitled, in the event of the failure of the plaintiff to pay it, to sell the securities pledged as collateral, without notice to the plaintiff, either at the New York Stock Exchange or at public or private sale, and apply the proceeds to the payment of the note. . Prior to August 5, 1884, the margin fell below the 20 per cent. prescribed in the note, and on that day the defendant served upon the plaintiff the following demand:

"UNITED STATES TRUST COMPANY OF NEW YORK, 49 WALL STREET.
                                    "N. Y., Aug. 5, 1884.
"W. S. Williams, Esq.—DEAR SIR: That there may be no misapprehension in regard to your time loan of Mch. 1st, '84, we beg you to understand that we have made a demand for the payment of the loan, on the ground that the margin is below the 20% conditioned for in your note, and request that you confirm the above by letter, and return same by bearer, and oblige,
      "Yours, very truly,                      L. G. K., A. Sec."
On the same or the next day the plaintiff sent to the defendant this reply:
                                    "32 BROAD ST., Aug. 5, 1884.
"DEAR SIR: I beg to confirm the facts, as stated in yours of even date, in regard to my loan of Mch. 1, 1884, and to state in reply that I shall very soon hope to make the margin good, and trust no sales will be made of the securities for the present.
      "Yours, truly,                          W. S. WILLIAMS. ·
"L. G. Hampton, As. Secy."

· It is claimed by the plaintiff that the defendant had waived its right to sell the bonds by reason of the failure of the plaintiff to furnish more margin. That contention is based upon the evidence of the plaintiff, who testifies that, at an interview between him and Mr. Stewart, the president of the company, either on the 1st or the 4th of August, the following conversation occurred: "Question. State all that was said on that occasion,—whether it was the 1st or the 4th when he said, as you say, that he would not sell any bonds below eighty. Answer. I went into the office of Mr. Stewart with the note in my hand, notifying me of the sale of twenty-two bonds out of the call loan,—out of the lot of fifty,—at the price of eighty. I said to Mr. Stewart, with this note in my hand, 'What does this mean?' You have been selling my bonds here.' He said, 'Then you must pay your loan.' Said I, 'Certainly I will pay my loan; I did not know that you wanted it.' This was in reference to the small loan. He said, 'When will you pay it?' I said, 'I will pay it to-day, or it would suit me better on Monday.' This was Friday, August 1, 1884. 'Monday will do,' was his reply. I said, 'I will bring you a check on Monday. You must not sell my bonds. They cost me a great deal more money, and I cannot afford to have them sold.' He said, as he walked along the side of the railing, 'I won't sell any more of your bonds below eighty;' leaving me to infer that I would have notice before he sold them." The witness continued: "I do not know as there was any one else present. I think gentlemen were in the room. The market was then at about eighty, and since the 1st of March it had declined from about ninety or ninety-four. It didn't decline any more after that, I believe. During the time from the 1st of March down to the 1st of August it had declined. I do not think it had been all the time declining. It had declined from ninety to eighty-four, and down to eighty. It would be in Mr. Stewart's discretion when the bonds would have got below eighty, and declining, as to whether he would need to sell to make his loan. If he let them drop below seventy, relating to that loan, he would not get his loan out of the securities. He did not fix any limit below

eighty at which he would not sell. I understood him to promise me that, even though these securities would drop to fifty, still he would not sell without notice to me. That was my understanding. I stated what he said, that he would not sell any of my bonds below eighty. He didn't fix any limit of time that this promise of his would cover, any further than he said he would sell no bonds below eighty. *Question.* Forever? *Answer.* That was the way it was left; and I went out of that office understanding that there was an agreement with him that he held these bonds at eighty, and not a dollar less, in any event; and that there would be no change without notice to me. That was the way I understood it. Nothing was said about notice. I was led to infer that. Certainly he could revoke it by notice to me. From your reading of this stock-note, this promise of his, as I swear to it, is evidently directly contrary to the provisions of the note that the company was always to be entitled to call for margin to the extent of twenty per cent. above what was necessary to cover the loan. I understood Mr. Stewart's agreement as I have stated. That was the understanding between Mr. Stewart and myself, and I left the office on the 1st or 4th of August with that impression or belief. I offered no inducement to Mr. Stewart for giving such an extraordinary change of this agreement. I paid him nothing except to pay up the loan, and take my securities away. I gave him no consideration on the 1st or 4th of August on the $300,000 loan. Mr. Stewart, the president of the company, made this promise, destroying the effect of the agreement in the note without any inducement or consideration, as a purely voluntary offer on his part. This is my positive assertion. I did not think he was a fool for doing it. I think he knew of my responsibility. If my counsel in his opening stated that my whole fortune was involved in this $300,000 loan, and the bonds that secured it, he was mistaken, because I was the owner at that time of over $1,200,000 of these bonds. I left the office that day understanding that Mr. Stewart would take no action against me in the sacrifice of my securities without my being notified of it. I did not understand he gave up any agreement. I did not say that this promise was entirely contrary to the terms of this agreement for twenty per cent. I do not know that it was. While he remained under a promise not to sell them at eighty, he, if he assumed the responsibility, could sell them, if he called for margin, and I did not give it. I did not question his right to revoke it, but I went out of the office supposing that I should not be troubled without notice. I do not know whether I received the letter of August 5th. (Letter shown witness.) I do not say I did not receive it. I have no recollection of having received it." It will be observed that this interview, if it took place on the 4th of August, happened only one day before the date of the letters above set forth. In regard to the letters of August 5th, the witness testified as follows: "I say I have no recollection of having received that letter. I have not denied the receipt of it. You can bring it to my notice, however. That is my signature, but not my writing. Unquestionably it was in reply to this letter which Mr. Hampton has proven. I guess the trust company drew that for me to sign, and then I signed it. When I received this letter on August 5th, which I answered the next day, I saw at once that it was entirely inconsistent with the promise that I have testified that Mr. Stewart had made with me on the day before, and that letter is confirmatory to me that he did make the promise on the day before. I regarded this letter as a revocation of the promise, and I understood when I left on the 1st that he had the right to revoke it of course. I do not think I went to Mr. Stewart after giving him a reply. I think I did not go to him, and say, 'Mr. Stewart, your letter is inconsistent with the promise you made me yesterday.' I do not know as I gave it any consideration at that time; I do not remember that I did. * * * I was absent the greater part of the time between the 5th day of August, when I wrote that last letter, and the 1st day of September, when the loan fell due,

according to the terms of the note. I did not carry him any further margin, as I promised by the letter of the 5th of August, or any security whatever. I knew he was refraining or holding the loan as it was, as a matter of pure indulgence to me, but not on the strength of that letter. I do not know that the letter had anything to do with it. I knew that by the terms of the contract he had a right to sell. The promise of the 1st of August had been revoked by this previous letter."

It seems to us that the evidence of the plaintiff is entirely inconsistent with the theory that the defendant had waived any of its rights under the note. He admits that the letter from the defendant was inconsistent with the alleged promise of Mr. Stewart; that he regarded it as a revocation of the promise; and that when he left, after the promise was made, he understood that the defendant had a right to revoke it of course. If there was no waiver of the rights of the trust company, as expressed in the note, we find no difficulty in affirming this judgment. However stringent or harsh the provisions of the contract between the parties may seem to be, when viewed in the light of subsequent events, it was one which they were perfectly competent to make, and one which the plaintiff, as a banker and financier in this city since 1858, thoroughly understood. It is claimed, however, that the provision of the note, which permits the defendant to sell without demand and without notice, only applies to a sale necessitated by the failure of the plaintiff to keep his margin good. This construction of the note we cannot assent to. It would be anomalous that a power to sell, without demand and without notice, should be given for a failure to keep the margin good, and should not be agreed to, when the whole of the principal sum should become due. Such a contract might be made, but it was not, in our opinion, made in this instance. We have examined the exceptions taken by the plaintiff's counsel during the trial, but do not regard them as well founded. Our examination of the record in this case leads us to the conclusion that no error was made by the learned justice, before whom the cause was tried, in dismissing the complaint; and as the evidence clearly showed that, after the sale of the securities, there still remained due to the defendant the sum of $2,465.87, a verdict was properly directed in favor of the defendant for that amount. The judgment below must therefore be affirmed, with costs and disbursements to the respondent. All concur.